**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY COMPANY, CHICAGO INSURANCE COMPANY, AND NAUTILUS INSURANCE COMPANY,** | ) ) ) ) ) | |
| | ) | **Case No. 11 C 459** |
| **Plaintiffs,** | ) | |
| **Counter-Defendants,** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **v.** | ) | |
| | ) | |
| **TODD A. DUCKSON,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| **Counter-Claimant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Continental Casualty Company, Chicago Insurance Company and Nautilus Insurance Company ("Insurers"), and Defendant Todd A. Duckson ("Duckson") bring cross-motions for judgment on the pleadings to determine whether Insurers have a duty to defend, pay "claim expenses," and/or indemnify Duckson in a pending Securities and Exchange Commission ("SEC") lawsuit under the terms of Lawyers Professional Liability Policy No. 198276838 (the "Policy").

# I. BACKGROUND FACTS

## A.  OVERVIEW

Duckson was employed as a partner in the Minneapolis office of the Chicago-based law firm Hinshaw & Culbertson LLP ("Hinshaw") from 2003 to December 31, 2008. Hinshaw purchased a claims-made lawyers professional liability insurance policy from Insurers which covered all attorneys employed by the firm.  Duckson performed legal services on behalf of an investment fund (the "Fund") during 2008.

The SEC filed suit against the Fund and Duckson, among others, on September 21, 2010, in the United States District Court for the District of Minnesota (10 C 3995) (the "SEC action").  The SEC complaint alleges that Duckson, acting as outside counsel to the Fund, made materially false and/or misleading statements about the Fund orally and in writing. SEC Compl. ¶ 51.[1]  More specifically, the complaint alleges that in the course of his representation, Duckson assisted in the preparation of two private placement memoranda, both of which were materially misleading.  *Id.* ¶¶ 53-62.

Duckson submitted a claim to Insurers under the Policy, which Insurers denied on December 9, 2010.  Insurers now seek a declaratory judgment that there is no duty to defend or indemnify Duckson because the SEC action does not seek damages covered by the Policy.

---

[1]Insurers attached two exhibits to their First Amended Complaint. Dk. 9.  Exhibit A is the Policy ("Policy") issued to Hinshaw.  Pls.' Am. Compl. Ex. A.  Exhibit A contains the original policy and a series of single page documents that are either endorsements or amendments to the original policy.  In this Memorandum Opinion & Order, citations to the Policy refer to the relevant numbered page of Exhibit A.  Exhibit B is the SEC Complaint ("SEC Compl.").  Pls.' Am. Compl. Ex. B.  All citations to "SEC Compl." refer to Plaintiffs' Exhibit B.

Duckson counterclaims for a declaratory judgment that he is entitled to coverage for defense of the SEC action and that Insurers' owe him indemnity coverage for his "claim expenses" and potential damages. Duckson also seeks damages for breach of contract. Both parties seek costs and attorney's fees related to this case. The case is now before the Court on cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

## B.     THE SEC ACTION

The SEC alleges that Duckson and others "misleadingly stated that the Fund would use proceeds raised from investors primarily to make real estate loans and other investments," and made "false and/or misleading statements and/or material omissions to brokers who were involved in selling the Fund to the brokers' customers." SEC Compl. ¶¶ 12, 52. The SEC complaint alleges civil causes of action against Duckson for: (1) violating sections of the Exchange Act and (2) violating sections of the Securities Act; or, in the alternative, (3) aiding and abetting those violations. *Id.* ¶ 15. The SEC seeks: (1) a declaratory judgment; (2) permanent injunctive relief; (3) disgorgement of ill-gotten gains plus prejudgment interest thereon; (4) civil penalties; and (5) officer-director bars. *Id.* at pp. 28-30.

## C.    RELEVANT POLICY PROVISIONS

Although the Policy is over thirty pages long, this litigation centers on a very few provisions relating to the issues of coverage, the duty to defend, and reimbursement for "claim expenses."  The first section of the Policy is titled "Insuring Agreement" and includes four paragraphs.  The first two paragraphs of the Policy, "coverage" and "defense,"[2] read as follows:

A.    Coverage

The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the policy period by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:

1.    no **Insured** gave notice to a **prior insurer** of such **claim** or a **related claim**;

2.    no **Insured** gave notice to a **prior insurer** of any such act or omission or related act or omission;

3.    prior to the date an **Insured** first becomes an **Insured** under this Policy or became an **Insured** under the first policy issued by the **Company** (or its subsidiary or affiliated insurers) to the **Named Insured** or any **predecessor firm**, whichever is earlier, of which this Policy is a renewal or replacement, no such **Insured** had a basis to believe that any such act or omission, or **related act or omission**, might reasonably be expected to be the basis of such **claim**;

---

[2]The Policy's original "defense" paragraph was deleted and replaced with an updated "defense" paragraph via the "Limited Self Defense/Mutual Choice" amendment.  Policy at 25 ("Limited Self Defense/Mutual Choice").

4.    there is no other policy, whether primary, contributory, excess, contingent or otherwise, which provides insurance to any **Insured** for the **claim** based on or arising out of an act or omission in the performance of **legal services** by such **Insured** or by any person for whom such **Insured** is legally liable while "affiliated" with a firm other than the **Named Insured**.  As used herein, "affiliated" includes acting as Of Counsel for a firm other than the **Named Insured**.

Policy at 2 (emphasis in original).

B.    Defense (as modified by the Limited Self Defense/Mutual Choice Endorsement)

The **Named Insured** shall have the right to defend in the **Insured's** name, and on the **Insured's** behalf, any **Claim** and offset any **Claims Expenses** incurred in the defense of a **Claim** up to $250,000, of the deductible amount.  Once such amount has been incurred by the **Named Insured**, the **Company** will have the right and will defend any **Claim** covered by this Policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent.  The **Company** and the **Named Insured** shall mutually agree on the appointment of counsel to investigate and to defend any **Claim**.  In the event that a **Claim** shall be subject to arbitration or mediation, the **Company** and the **Named Insured** shall mutually agree on the choice of arbitrators or mediators and in the conduct of any arbitration or mediation proceedings involving a **Claim** covered by the Policy.  Either party's agreement to defense counsel, mediators, or arbitrators shall not be unreasonably withheld.

Policy at 2, 25 ("Limited Self Defense/Mutual Choice") (emphasis in original).

Section III of the Policy defines several key terms:

"Claim" means "a demand, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the **Insured** for money or services arising out of an act or omission, including personal injury, in the rendering of or failure to render **legal services**."  Policy at 4 (emphasis in original).

"Claim expenses" are:

A.  fees charged by attorneys designated by the **Company** or by the **Insured** with the **Company's** written consent; and

B.  all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a claim if incurred by the **Company**, or by the **Insured** with the written consent of the **Company**, including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Company** to apply for or furnish any such bond.

C.  all costs taxed against an **Insured** in defense of a **claim**; and

D.  all interest on the entire amount of any judgment which accrues after entry of the judgment and before the **Company** has paid that part of the judgment which does not exceed the limits of liability stated in Section II A. above.

Policy at 4-5 (emphasis in original).

"Damages" are defined as any "judgments, awards and settlements (including pre-judgment interest), provided any settlements [are] negotiated with the assistance and approval of the **Company**." Policy at 5 (emphasis in original). The Policy explicitly excludes the following items from the definition of "damages":

A.  costs and expenses paid or incurred or charged by any **Insured**, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing;

B.  civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 18 U.S.C. 1961, et. seq., Federal Rules of Civil Procedure 11 or 28 U.S.C. 1927 and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;

C.  punitive or exemplary amounts [is deleted in its entirety but only where the law applicable to the claim mandates such coverage];

D.  the multiplied portion of multiplied awards;

E.  injunctive or declaratory relief;

F.  any amount for which an Insured is absolved from payment by reason of any covenant, agreement or court order.

*Id.* (as modified by "Return of Legal Fees," Policy at 24, and "Punitive Damages Coverage Endorsement," Policy at 22).

## II.  JURISDICTION

This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  Defendants Continental Casualty Company and Chicago Insurance Company are insurance companies incorporated under the laws of the State of Illinois with their principal places of business located in Chicago, Illinois.  Nautilus Insurance Company is an insurance company incorporated under the laws of the State of Arizona with its principal place of business located in Scottsdale, Arizona.  Duckson is a citizen of the State of Minnesota.  Insurers plead that the amount in controversy exceeds $21,000,000.  This Court has jurisdiction over the action pursuant to 28 U.S.C. § 2201 and there exists a justiciable controversy appropriate for resolution by this Court.  The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

## III.  LEGAL STANDARDS

The parties bring cross-motions for judgment on the pleadings.  Fed. R. Civ. P. 12(c) allows parties to file for a motion for judgment on the pleadings any time after the pleadings are closed.  All well-pleaded facts are accepted as true.  *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).  Rule 12(c) is appropriate where no issue of material fact

remains and the question is one of law. *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987); *PNC Bank v. Djurin*, No. 10 C 3785, 2011 U.S. Dist. LEXIS 91831, at *8 (N.D. Ill. Aug. 16, 2011). Under Illinois law, construing the provisions of an insurance policy is a question of law. *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1089-90 (Ill. 2007). The Court may consider only the pleadings, which consist of the complaint, the answer, and any written instruments attached as exhibits. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend.*, 163 F.3d 449, 452 (7th Cir. 1998).

## IV.  ISSUES PRESENTED

1.     Whether the Court should apply Minnesota or Illinois substantive law to interpret the Policy.

ANSWER:  Illinois.

2.     Whether Insurers have a duty to defend Duckson in the SEC action.

ANSWER:  No.

3.     Whether Insurers are obligated to pay Duckson's defense costs and related "claim expenses" in the SEC action.

ANSWER: No.

4.     Whether Insurers are obligated to indemnify Duckson for a future judgment against him arising out of the SEC action.

ANSWER: This claim is premature and is therefore dismissed without prejudice.

## V.  DISCUSSION

## A.     CHOICE OF LAW

The Policy does not contain a choice of law provision. A federal court must engage in a choice-of-law analysis when the laws of two states differ such that application of one state's law over that of another will affect the outcome of the case. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 n.1 (7th Cir. 2009). Where no conflict exists, a court should apply the laws of the forum state. *Id.* Duckson argues that Minnesota law applies while the Insurers argue that Illinois law applies, though neither side has presented a clear conflict between the substantive laws of those two states. Absent a conflict, Illinois law applies. Because the parties have briefed and argued the issue, the Court will engage in a choice-of-law analysis before analyzing the Policy at issue.

### 1. Choice-of-Law Analysis is Governed by Contract Choice of Law Rules.

In a diversity action where a conflict of law exists, a court must apply the choice-of-law principles of the forum state. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009). Illinois courts apply the "most significant contacts" test from the *Restatement (Second) of Conflicts* § 188 (1971), in deciding choice-of-law disputes with respect to insurance contractual issues. *Jupiter Aluminum Corp. v. Home. Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000); *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995).

## 2. Illinois Law Applies Because Illinois has the Most Significant Contacts with the Policy.

When evaluating an insurance policy that lacks a choice-of-law provision, such as the Policy here, the "most significant contacts" test looks to the following factors: (1) the location of the subject matter; (2) the place of delivery of the contract; (3) the domicile of the insured or of the insurer; (4) the place of the last act to give rise to a valid contract; (5) the place of performance; or (6) any other place bearing a rational relationship to the contract. *Jupiter Aluminum Corp.*, 225 F.3d at 873; *Lapham-Hickey Steel Corp.*, 655 N.E.2d at 845.

In cases where the insured risk can be localized in one state, Illinois courts give the location of the risk or subject matter the greatest emphasis. *See, e.g.*, *Soc'y of Mount Carmel v. Nat'l Ben Franklin Ins. Co. of Ill.*, 643 N.E.2d 1280, 1287 (Ill. App. Ct. 1994) (evaluating insurance policy coverage of a specific school for which the insured risk could be easily localized). On the other hand, where the risk extends into multiple states, this factor enjoys little weight. *Lapham-Hickey Steel Corp.*, 655 N.E.2d at 845 (noting that in such cases courts should minimize the location-of-the-subject-matter factor in order to "obtain a consistent interpretation of the policy"); *Liberty Mut. Fire Ins. Co. v. Woodfield Mall, L.L.C.*, 941 N.E.2d 209, 215-16 (Ill. App. Ct. 2010) (evaluating insurance policy coverage of a nation-wide chain store).

A case in which the policy provides itemized premises liability coverage for "a few specific locations" is distinguishable from a situation in which the insurance policy provides blanket umbrella coverage for operations in numerous states. *Liberty Mut. Fire Ins.* Co., 941

N.E.2d at 216-17.  This Policy covers insured risk that cannot be easily localized in a single state, but rather "involves the possibility that [the insured] will cause injury in some other state."  *See Evangelical Lutheran Church in Am. v. Atl. Mut. Ins. Co.*, 169 F.3d 947, 950 (5th Cir. 1999) (applying an Illinois choice-of-law analysis).

Since *Lapham-Hickey*, Illinois courts have de-emphasized the location of the insured loss where the risks are spread nationwide.  *Liberty-Mutual*, 941 N.E.2d at 216-17.  In *Emerson Electric*, which involved a dispute over liability for environmental damage in various states, the Illinois appellate court focused on which location was likely contemplated by the parties as the source of law and would serve the goals of "predictability and uniformity of result."  *Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 743 N.E.2d 629, 642 (Ill. App. Ct. 2001).  The court looked to the corporation's principal place of business, where the policy was delivered, where the contracts were kept, and where the policy payments took place.  *Id.* at 640-41.  In the case at bar, the "Declarations" page of the Policy lists Hinshaw and its Chicago mailing address as the Insured, the policy broker is listed with an Illinois address, and to report a claim the firm must contact an individual in Illinois.  Policy at 1 ("Declarations").  Two of the three Insurers are domiciled in Illinois, while the third is domiciled in Arizona.  The Policy contains three Illinois-specific endorsements on the headings of three amendments and are the only references to a specific state in the Policy.[3] Policy at 27-30.  All of these factors indicate that the parties most likely contemplated Illinois

_____

[3] 1) "Amendatory Endorsement - Conditions - Illinois"; 2) "Amendatory Endorsement - Extended Reporting Period - Illinois"; and 3) "Amendment of Termination Provisions - Illinois."

as the source of law and the application of Illinois law to a law firm with offices in multiple states serves the goal of predictability and uniformity of result.

Factors potentially leaning towards application of Minnesota law include that Duckson is domiciled in Minnesota and that the SEC brought the underlying lawsuit against Duckson in a Minnesota court. But "the place where the underlying action was filed 'cannot be equated with the location of the [national] subject matter or insured risk' and is entitled to 'little or no significance.'" *Liberty Mut. Fire Ins. Co.*, 941 N.E.2d at 218 (alteration in original) (quoting *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 962 (Ill. App. Ct. 2001)). Moreover, the location of the alleged incidents giving rise to the SEC litigation—Duckson's performance of legal services in Minnesota on behalf of a Minnesota client—is irrelevant because the location of incidents giving rise to the underlying litigation is not a factor in Illinois's choice-of-law rule for insurance contracts. *Gann v. Oltesvig*, 508 F. Supp. 2d 654, 657 (N.D. Ill. 2007). Therefore, Illinois law applies.

## B.     POLICY COVERAGE

The parties dispute the scope of coverage of the Policy. Three coverage obligations are at issue. The first is whether the Insurers have a duty to defend Duckson. Second is whether they are obligated to pay his "claim expenses," even if not required to defend him. Third is whether they are obligated to indemnify Duckson in the event of a judgment against him in the SEC litigation.

When applying state law, the court looks first to the highest court of the forum state to ascertain the substantive content of state law. *Thomas v. H&R Block E. Enters., Inc.*, 630 F.3d 659, 663 (7th Cir. 2011). Where state law is unsettled, a federal court must attempt to predict how the state's highest court would rule if confronted with the particular issue. *Id.* If the Supreme Court of Illinois has not spoken on an issue, a federal court applying Illinois law looks to Illinois intermediate appellate courts. *Id.* These decisions control unless persuasive indicators suggest that the Supreme Court of Illinois would decide the issue differently. *Id.*

Under Illinois law, the construction of an insurance policy is a question of law. *Rich*, 875 N.E.2d at 1089-90. The Illinois Supreme Court in *Rich* set forth the governing principles for this Court to apply:

> When construing the language of an insurance policy, a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy. Because the court must assume that every provision was intended to serve a purpose, an insurance policy is to be construed as a whole, giving effect to every provision, and taking into account the type of insurance provided, the nature of the risks involved, and the overall purpose of the contract. "All the provisions of the insurance contract, rather than an isolated part, should be read together to interpret and to determine whether an ambiguity exists." If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning, and the policy will be applied as written, unless it contravenes public policy.
>
> If the words used in the insurance policy are reasonably susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy. This is especially true with respect to provisions that limit or exclude coverage. A contract is not rendered ambiguous merely because the parties disagree on its meaning. A court will consider only reasonable interpretations of the policy language and will not strain to find an ambiguity where none exists. "Although policy terms that

limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous."

*Id.* at 1090 (citations omitted).

1.  **Insurers Do Not Have a Duty to Defend Duckson in the SEC Action Because the Relief Sought by the SEC Falls Outside the Scope of Covered Damages.**

    a.  **The duty to defend is not triggered unless the underlying complaint alleges covered damages.**

The duty to defend is broader than the duty to indemnify, but it is not unlimited. *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 810 (7th Cir. 2010). To determine whether there is a duty to defend in an insurance coverage case, Illinois courts compare the factual allegations in the underlying complaint with the relevant policy provisions. *Id.* If a single cause of action in the underlying complaint potentially falls within the policy's coverage, the duty to defend is triggered. *Id.* The policy terms and allegations in the underlying complaint are liberally construed in favor of the insured, and doubts and ambiguities are resolved against the insurer. *Id.* at 811. However, the paramount rule of reasonable contract construction takes precedence over favoring the insured. *Id.*

Under the Policy, the Insurers are to defend any claim "covered by this Policy." Policy at 25. Duckson does not contest the well-establish principle that covered damages are required to trigger the duty to defend. Indeed, two Illinois appellate courts interpreting the same or similar policy provisions have concluded that the duty to defend requires two factors to trigger coverage, one of which is that the underlying suit seek covered damages. *Cont'l Cas. Co. v. Donald T. Bertucci, Ltd.*, 926 N.E.2d 833, 839 (Ill. App. Ct. 2010) ("This

particular insuring agreement expressly limits the scope of coverage to legal proceedings which allege both covered 'damages' *and* 'an act or omission in the performance of legal services.'"); *Cont'l Cas. Co. v. Law Offices of Melvin James Kaplan*, 801 N.E.2d 992, 996 (Ill. App. Ct. 2003) ("Continental correctly asserts that two requirements must be met in order to trigger coverage under the Policy.  First, the claim…in the underlying action must have arisen by reason of an act or omission in performance of legal services.  Second, the recovery sought in the underlying action must fall within the Policy's definition of damages.").  Duckson contends relief sought by the SEC constitutes covered damages under the Policy.  Continental disagrees.

> **b.    Relief sought by the SEC does not fall within the Policy's definition of damages.**

The question concerning the Insurer's duty to defend is whether the relief sought by the SEC falls within the Policy's definition of "damages."[4]  The SEC seeks the following relief from Duckson: (1) a declaratory judgment; (2) injunctive relief; (3) disgorgement of ill-gotten gains; (4) civil penalties; and (5) officer-director bars.  SEC Compl. at pp. 28-30.

Several types of relief sought are specifically excluded from the definition of "damages."  The "damages" provision of the Policy specifically excludes "injunctive or declaratory relief."  Policy at 5.  The "officer-director bar" is a type of injunctive relief and therefore falls within the same exclusion.  The "damages" definition specifically excludes

---

[4]"'Damages' mean judgments, awards and settlements (including pre-judgment interest), provided any settlements [are] negotiated with the assistance and approval of the **Company**." Policy at 5.

"civil or criminal fines, sanctions, penalties, or forfeitures, whether pursuant to law, statute, regulation or court rule, . . . and injuries that are a consequence of any of the foregoing." *Id.*

In order to avoid the clear language of the Policy, Duckson argues that both "disgorgement of ill-gotten gains" and "civil penalties" are damages within the meaning of the Policy because of the potential use of the funds received in the disgorgement or civil penalties to compensate victims. Duckson urges the Court to look beyond the labels used by the SEC to describe the relief sought in its *ad damnum* clause. Duckson asserts that under the Fair Fund Provision, 15 U.S.C. §7246, the SEC may place sums received as civil penalties and disgorgement of ill-gotten gains in a fund to be used to compensate victims. Duckson argues that because money received as civil penalties or disgorgement of ill-gotten gains can be used to compensate victims, that money is no longer restitutionary in nature.

In similar situations, Illinois courts have held that the disgorgement or restitution of ill-gotten gains is not covered by insurance where such relief is restitutionary in nature. *See, e.g.*, *Level 3 Commc'ns v. Fed. Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001). In *Level 3*, the Seventh Circuit found that "a 'loss' within the meaning of an insurance contract does not include the restoration of ill-gotten gain." *Id.* at 910. The court reasoned that where relief is restitutionary in character—i.e. "it seeks to deprive the Defendants of the net benefit of the unlawful act"—it is not a loss. *Id.* at 911. Further, "An insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used . . . ." *Id.*

While the present policy covers "damages" rather than "loss," the Court finds that

*Level 3* controls: the return of profits obtained illegally does not constitute covered damages under Illinois law. The *Level 3* court acknowledged that polices that use the term "damages" rather than "loss" may be distinguishable, but termed that distinction "tenuous." *Id.* at 910. Moreover, the policy in *Level 3* actually defined "loss" to include damages. *See Ryerson v. Fed. Ins. Co.*, No. 09 C 4173, 2010 WL 6882694, at *2 (N.D. Ill. Sept. 30, 2010). Similarly, in *Local 705*, a case relied upon in *Level 3*, an Illinois intermediate appellate court found that the return of money unjustly obtained did not constitute a loss under a policy that defined "ultimate net loss" to include "damages." *Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.*, 735 N.E.2d 679, 684 (Ill. App. Ct. 2000); *see also Republic W. Ins. Co. v. Spierer*, 68 F.3d 347, 351 (9th Cir. 1995) (finding that restitutionary payments are not "damages").

Duckson points to *Nutmeg Insurance Co. v. East Lake Management & Development Corp.*, No. 05 C 1328, 2006 WL 3409156, at *7 (N.D. Ill. Nov. 21, 2006), for further support on the difference between coverage of "loss" and "damages." The *Nutmeg* court distinguished that case from *Level 3* in two ways. The court did acknowledge the difference between "damages" and "loss." *Id.* The court then explicitly found that the restitutionary damages sought in the underlying case were "fundamentally different" from those sought in securities-fraud cases. *Id.* In *Nutmeg*, the statutory damages at issue required the court to identify the restitution amount (the total amount that a landlord wrongfully withheld) and then double it, which makes it punitive and thus provides a recovery that is more than restitution. *Id.* The case at bar, however, is a securities fraud case and the Court finds *Level*

*3* on point and controlling. "Losses avoided" do not bring the relief within insurable damages because they are still restitutionary in nature—the goal is to deprive a defendant of his unjust enrichment.

The parties debate at length *St. Paul Mercury Insurance Co. v. Foster*, 268 F. Supp. 2d 1035 (C.D. Ill. 2003). In *Foster*, the court held that while some of the damages alleged in the underlying complaint were plainly uninsurable under *Level 3*, there was additional potential relief that may not have been resitutionary in nature. *Id.* at 1044. The potentially non-restitutionary recovery there, however, included loss of value of stocks resulting from illegal acitivity, relief from defendants who did not sell stock in the transaction at issue, and defense costs. *Id.* at 1045. While *Foster* does confirm that there need only be potential for covered damages, it does not undermine the proposition that "disgorgement of ill-gotten gains" is restitutionary in nature. In *Foster* the court stated that, regarding the potentially non-restitutionary relief, "different measures of damages may theoretically be available." *Id.* On the other hand, in the case at bar, the relief sought by the SEC is either restitution or explicitly excluded by the Policy.

The Sarbanes Oxley Act of 2002 established the ability of courts to create Fair Funds for monies from disgorgement and civil penalties which are then to be distributed to investors. 15 U.S.C. §7246(a). Following the adoption of the Fair Funds statute, courts across the country have explained that the purpose of disgorgement in SEC suits is to prevent unjust enrichment rather than to punish the defendants. *See, e.g.*, *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2nd Cir. 2006) ("Although

disgorged profits may be distributed to defrauded investors, '[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains.'"); *SEC v. Duffner*, 517 F. Supp. 2d 502, 511 (D. Mass. 2007) ("The purpose of disgorgement is to prevent unjust enrichment and, as such, it is an equitable remedy and 'does not serve to punish or fine the wrongdoer, but simply serves to prevent the unjust enrichment.'"). Moreover, the Fair Fund does not change the measure of disgorgement of ill-gotten gains: the measure is the unjust enrichment of the defendant, not the losses sustained by investors. *Id.* Duckson offers no evidence that the calculation of any relief awarded under "disgorgement" would be non-restitutionary.

The Policy specifically excludes civil penalties as covered "damages," and the disgorgement of ill-gotten gains does not constitute damages in Illinois. The creation of the Fair Fund does not change the essential nature or measurement of a civil penalty or disgorgement of ill-gotten gains. In summary, none of the relief sought by the SEC constitutes "damages" under the Policy and therefore, the duty to defend is not triggered.

## 2. Insurers Have No Duty to Pay Duckson's "Claim Expenses" in the SEC Litigation.

Duckson argues that the Policy creates at least three entirely independent obligations. First, the duty to defend; second, the duty to pay "damages"; and third, the duty to pay "claim expenses." Duckson urges a "deconstruction" of the Policy by which the "coverage" and the "defense" paragraphs of the "Insuring Agreement" are read independent of one another. Duckson argues that the "coverage" paragraph obligates the Insurers to pay all of his "claim

expenses," which would include his SEC action defense costs. The only prerequisites for that coverage, according to Duckson, are: 1) a claim, defined as a "demand, including the service of suit . . . for money or services"; 2) that the claim be made against Duckson; 3) that the claim be reported in writing to the Insurers; and 4) that the claim arise out of an act or omission in the rendering or failure to render legal services during the policy period.

Insurers first contend that Duckson has not properly placed the issue of "claim expenses" before the court. Duckson's counterclaim seeks a declaratory judgment that he is entitled to defense of the SEC Action, a breach of contract action alleging that Insurers' have breached their duty to defend Duckson, and a declaratory judgment that Insurers are obligated to indemnify Duckson in the SEC action. The counterclaim is drafted in broad enough terms to include whether Insurers owe Duckson coverage of his defense in the SEC action, whether under a duty to defend or through indemnification of his "claim expenses." The parties have both briefed and argued the "claim expenses" point and the Court will decide this issue on the merits.

Neither party has pointed the Court to case law deciding whether a similar insurance policy creates an obligation to pay "claim expenses" even though the underlying lawsuit does not seek covered damages. Thus, the Court finds that it is confronted with an issue of first impression under Illinois law.

The Court reiterates that in Illinois, courts are to construe an insurance policy as a whole, taking into account the type of insurance purchased, the risks undertaken and purchased, the subject matter that is insured, and the purposes of the entire contract. *See,*

20

*e.g.*, *Nicor, Inc. v. Associated Elec. & Gas Servs.*, 860 N.E.2d 280, 286 (Ill. 2006). When construing an insurance policy, a court's goal is to determine the parties' intentions as expressed in the agreement. *Erie Ins. Exch. v. Triana*, 923 N.E.2d 861, 864 (Ill. App. Ct. 2010). The question is whether a provision is subject to more than one reasonable interpretation, not whether other possibilities can be suggested. *Id.*

The Policy consists of seven major sections.[5] Section I, "Insuring Agreement," is the "portion of the insurance policy that describes both the insurer's and the insured's rights and duties under the contract. It states what kind of coverage is provided and the causes of loss or perils that will be covered." 1 Robert H. Jerry, *New Appleman on Insurance Law Library Edition* § 1.07(5) (2011). Thus, the four paragraphs under "Insuring Agreement," which include "coverage" and "defense," define the scope of the agreement and must be read in the context of one another. Duckson argues that the "claim expenses" obligation is an indemnity obligation found in the "coverage" subsection and is separate from the duty to defend which is found in the "defense" subsection. Given the lack of precedent on this issue, the Court first turns to leading insurance law treatises to understand the use of "claim expenses" obligations in professional liability insurance policies.

The duty to reimburse defense costs is often part of an insurance policy which contains a provision for reimbursement of defense expenses, but no separate duty to defend paragraph. 1 Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 9.04, at 9-136 (2010

---

[5]The seven sections are: I. Insuring Agreement; II. Limits of Liability and Deductible; III. Definitions; IV. Exclusions; V. Conditions; VI. Extended Reporting Periods; and VII. Headings. Policy at 2-13.

Supp.) ("A significant number of modified general liability policies or other types of liability policies . . . instead establish a regime where the policy holder selects counsel and conducts the defense but is entitled to reimbursement of defense costs."); Jeffrey E. Thomas, *New Appleman on Insurance: Current Critical Issues in Insurance Law* § 1 (November 2006) ("The duty to defend has been a part of liability insurance policies for decades. In recent years, however, some insurers have begun to offer insurance policies that do not include the traditional duty to defend language. . . . Instead of the duty to defend, some policies include a clause providing that the insurer will pay 'claim expenses' which are defined to include defense costs."); 2 Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insureds* § 6:20, at 6-193 (5th ed. 2007) ("Most liability policies that do not contain a duty to defend provision contain a provision obligating the insurer to indemnify the insured for the costs incurred in providing his or her own defense.").

The *Appleman* article, titled *The Scope of the Obligation to Pay Claim Expenses*, argues that the duty to pay "claim expenses" should be interpreted consistently with the duty to defend. Thomas, *supra,* § 1. The two obligations have the same purpose—insurers retain some control over the defense and the insured receives a rigorous defense. *Id.* The rationale behind replacing the duty to defend with an obligation to pay "claim expenses" is that it allows the insurer to take advantage of the self-insured retention and avoid payment for defense of smaller cases. *Id.* Courts have found that reimbursement of "claim expenses" is required when claims are successfully defeated as long as any of the claims would have been covered by the policy if proven. Windt, *supra*, § 6:20, at 6-194 to -195.

The Policy at bar reflects this new approach which provides the insured with certain rights to defend a claim, rather than requiring the insurer to provide the defense in the first instance. In the case at bar, the Policy contains a duty to defend as modified by the "Limited Self Defense/Mutual Choice" amendment. Duckson argues that, unlike those policies which replace the duty to defend with an obligation to pay "claim expenses," the Policy contains both obligations. According to Duckson, where the potential relief would be covered by the policy, the duty to defend is triggered. Duckson further argues that even where the underlying claim is outside the Policy's coverage, the Insurers have a separate obligation to pay for the entire defense by reason of the "claim expenses" provision of the Policy. The Court rejects this argument and concludes that no "claim expenses" are recoverable because the SEC action, as currently filed, is not covered by the Policy.

Duckson relies on *Beatty v. Doctors' Co.*, 871 N.E.2d 138 (Ill. App. Ct. 2007), to show that the duty to defend is a fiduciary obligation. His reliance on this case is helpful only to the extent that it confirms that a duty to defend and a duty to indemnify are not exactly the same—but it does not support his argument that there can be a fiduciary duty to defend and a separate, non-fiduciary, obligation to pay all of the costs associated with an insured's defense under the same policy. Notably, Duckson has not cited to the Court any cases finding an obligation to pay all "claim expenses," regardless of whether there is potential for liability. If anything, the common debate in "claim expenses" obligations is whether potential liability is enough, as in the duty to defend, or whether there must be actual

findings of liability covered by the policy, as in indemnity policies. *See* Windt, *supra*, § 6:20.

As previously discussed, two Illinois Appellate Courts have held, in interpreting the same or similar policy, that to meet the Policy's requirement for coverage the underlying court action against the insured must allege covered damages. *Bertucci, Ltd.*, 926 N.E.2d 833; *Law Offices of Melvin James Kaplan*, 801 N.E.2d 992. Duckson argues that reliance on *Bertucci* and *Kaplan* is misplaced because they dealt exclusively with the duty to defend. Duckson is correct that the Court cannot simply infer that the failure to address "claim expenses" was a determination that such obligation did not exist. *See Cooper Indus., Inc. v. Aviall Servs., Inc*, 543 U.S. 157, 170 (2004) (criticized on other grounds) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). However, the analytical progression of those decisions is important. The Illinois intermediate appellate courts read the "coverage" and "defense" paragraphs in tandem, basing much of the duty to defend analysis on the language of the "coverage" provision. Both courts found the "coverage" paragraph defines the scope of coverage of the entire policy and is the first hurdle to trigger coverage. *Bertucci*, 926 N.E.2d at 839; *Kaplan*, 801 N.E.2d at 996. Rather than considering the "coverage" and "defense" paragraphs as free standing, independent obligations, the courts understood the subsections of the "Insuring Agreement" as inter-related and a progression of requirements for coverage. *Bertucci*, 926 N.E.2d at 839; *Kaplan*, 801 N.E.2d at 996.

The Court acknowledges that the Policy could have been drafted in a more artful fashion. Nonetheless, based on current Illinois law, the Court predicts that the Illinois Supreme Court would find there is one reasonable interpretation of the Policy when it is construed as a whole. The "coverage" paragraph of the "Insuring Agreement" explains the circumstances in which a claim will trigger coverage. Policy at 2. It makes clear that the Insured must meet the deductible amount before the Insurers will become obligated to pay for damages and "claim expenses." *Id.* It sets out several typical requirements for coverage under a claims-made policy: another insurance company may not have been previously notified of the claim or a related act or omission; at the time of purchase of the Policy, the Insured did not have knowledge of acts or omissions that had the potential to become the basis for a claim; and no other insurance policy can cover the claim at issue. *Id.* The "coverage" paragraph does not create obligations of either party regarding how a defense is to be conducted or counsel selected.

The "defense" paragraph then elaborates on the process of defending a claim—both the Insured's and Insurers' rights and obligations. The original "defense" paragraph was replaced by a more elaborate provision under the amendment heading "Limited Self Defense/Mutual Choice," which is the operative paragraph. This paragraph gives Hinshaw, as the Named Insured, the right to defend Duckson or offset his "claim expenses" until $250,000 has been expended. After the Named Insured (Hinshaw) has spent $250,000, the Insurers have an obligation and right to take over the defense if the claim is covered by the Policy, even if the allegations are groundless, false, or fraudulent. The Company and the

Named Insured must mutually agree on counsel to investigate and defend "any Claim," and that agreement may not be unreasonably withheld. If Hinshaw spends less than $250,000 defending a claim that would eventually trigger the duty to defend, that amount may be taken as a deductible offset.

Duckson argues that the "coverage" paragraph references "any claim" while the "defense" paragraph is limited to claims alleging covered damages. The "defense" paragraph, however, alternatively refers to "any **Claim**," "any **Claim** covered by this Policy," "the **Claim**" and "a **Claim**." Policy at 25 (emphasis in original). The "defense" paragraph, in referring to "any claim," in fact uses the very language that Duckson argues is confined to the "coverage" paragraph. The two paragraphs cannot be read in isolation.

Further support for this construction is found when the Court considers how defense costs for which the Insurers are responsible arise. As Duckson argues, the "coverage" paragraph says that Insurers are responsible for "damages" and "claim expenses" for "any claim." Where there is a "demand . . . for money or services" (the definition of "claim") two costs are implicated—"damages" and "claim expenses." "Damages" are clearly defined, generally refer to eventual judgments or settlements, and are discussed at length above. "Claim expenses" are defined as well. Any attorney fees that are "claim expenses" must be incurred in one of two ways: either the Insurers appoint the attorneys or the Insured designates the attorneys with the Insurers' written consent. In turn, the "defense" paragraph is the *only* part of the Policy that elaborates on how agreement or consent to counsel is

obtained—it specifies that there must be mutual agreement, which may not be unreasonably withheld.

The "defense" paragraph, consistent with long standing insurance norms, is only triggered where the underlying complaint contains allegations which may result in indemnification liability for the Insurers. Thus, once a "demand for money or services" (a claim) is made and the claim is not barred by any exclusions listed in the "coverage" paragraph, the "defense" paragraph and the "damages" and "claim expenses" definitions—all together—define the costs covered by the Policy. Covered "claim expenses" are necessarily dependent on provisions in the amended "defense" paragraph. They are not expenses that can be incurred independent of the "defense" paragraph.

Based on current Illinois law, the Court predicts that the Illinois Supreme Court would reach the same conclusion if confronted with this issue. Specifically, the Court expects that the Illinois Supreme Court would read the "coverage" and "defense" paragraphs in conjunction. There are no persuasive indicators to suggest otherwise. To hold that Insurers have a duty to defend only when the underlying complaint seeks covered damages, but they must cover all costs of a defense regardless of whether they have any potential liability in the underlying suit would be unreasonable and would render the limitations on the duty to defend essentially meaningless. Thus, there are not separate obligations for defense and payment of "claim expenses" under the Policy. Duckson is not entitled to recover his defense costs because the SEC complaint, as it currently exists, does not seek relief covered by the Policy.

### 3. Although the Current SEC Action Does Not Establish a Duty to Defend, a Declaratory Judgment on the Issue of Potential Damages is Premature.

A decision on indemnification usually requires that the insured be legally liable for some amount of money and is dependent on the ultimate facts adjudicated at trial. *See Lear Corp. v. Johnson Elec. Holding Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); 3 Seth D. Lamden, *Appleman on Insurance* § 17.01 (2011). As discussed at length in the Court's duty to defend analysis, the current SEC complaint does not raise a covered claim for damages or "claim expenses" under the Policy.

The parties have requested the Court, in the interest of finality, to make a finding on indemnity obligations in the event of a judgment in the SEC action. Whether a dispute has progressed to a stage that would make a declaratory judgment appropriate is a question of federal practice rather than state law. *Lear Corp.*, 353 F.3d at 583. The Seventh Circuit regularly says that "a decision about indemnity should be postponed until the underlying liability has been established." *Id.* A decision that an insurer must indemnify an insured if there is a judgment against the insured has an advisory quality. *Id.* Even where the decision would not be solely advisory, such a decision may turn out to be irrelevant. *Id.*

However, the *Lear* court recognized that where a court "has devoted considerable effort to determining the scope of a defense obligation to resolve the parties' immediate dispute [it] may find it prudent to specify the scope of an indemnity duty at the same time if that subject also is in debate." *Id.* The lower court in *Lear* found that there was no duty to defend but, unlike the present case, did not do so by analyzing the potential liability of the insurers—the very question of indemnity.

The Declaratory Judgement Act gives district courts discretion to determine if it is appropriate to declare the rights of an interested party whether or not further relief is sought. 28 U.S.C. § 2201(a); *Nat'l Union Fire Ins. v. Manpower, Inc.*, No. 10 C 2382, 2011 WL 124242, at *4 (N.D. Ill. Jan 12, 2011). Practicality and wise judicial administration are the dominate considerations in the decision. *Nat'l Union Fire Ins.*, 2011 WL 124242, at *4.

The Court is mindful that the underlying SEC complaint may be amended or other circumstances could change during the pendency of the SEC suit. Although the duty to defend and claims expense issues are ripe for decision, the issue of indemnification for damages in the event of a judgment against Duckson is premature.

A dismissal without prejudice is more appropriate than a stay of this particular issue. *Id.* ("While courts in the past have issued stays of the indemnity issue pending the outcome of the underlying suits, the Seventh Circuit has clearly instructed district courts that a dismissal without prejudice is the proper resolution of the case." (citations omitted)). The Court finds that the most appropriate resolution of the motion for declaratory judgment on the issue of indemnification of potential damages, given the current posture of the SEC litigation, is to dismiss that portion of the case without prejudice.

# VI.  RULE 54(b) FINDINGS

Rule 54(b) of the Federal Rules of Civil Procedure states:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

*Fed. R. Civ. P. 54(b).*

To exercise discretion under Rule 54(b), the district court must find that there has been a final judgment that it is the ultimate disposition of an individual claim.  *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7-8 (1980).  The court must then determine whether there is any just reason for delay of appeal with consideration of judicial administrative interests and the equities involved.  *Id.*

The Court has entered judgments that are the ultimate disposition of multiple counts on the issues of the duty to defend and "claim expenses."  These issues require an early final resolution by means of a timely appeal.  The Court therefore finds no just reason to delay the entry of final judgment in favor of the Insurers on the issues decided by this Court.

# VII. CONCLUSION

For the reasons set forth in this opinion, the Court takes the following actions:

A. grants the Insurer's motion for judgment on the pleading with respect to Count I of its First Amended Complaint for Declaratory Judgment (there is no coverage under the Policy for the SEC action to trigger a duty to defend) and denies Duckson's motion for judgment on the pleadings with respect to Count I of his Counterclaim on this same issue;

B. denies Duckson's motion for judgment on the pleadings with respect to Count II of his Counterclaim (there is no breach of contract and no obligation to pay "claim expenses" for the SEC action);

C. denies Duckson's motion for judgment on the pleadings with respect to that portion of Count III of his Counterclaim that seeks indemnity for "claim expenses";

D. dismisses without prejudice that portion of Count III of Duckson's counterclaim that requests a declaratory judgment regarding indemnification of any judgments that may be entered against him in the SEC action;

E. denies the claim for attorney's fees to either party;

F. awards court costs to the Insurers; and

G. pursuant to Federal Rule of Civil Procedure 54(b) finds that there is no just cause to delay enforcement or appeal of the final judgments entered in favor of the Insurers and against Duckson on Count I of the Insurer's Amended Complaint for

Declaratory Judgment and on Counts I and II and part of Count III of Duckson's Counterclaim.

**SO ORDERED THIS 15th DAY OF NOVEMBER 15, 2011.**

*Morton Denlow*
_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Ann Patton Goodman
Joseph Ryan Menning
McCullough, Campbell & Lane LLP
205 North Michigan Avenue
Suite 4100
Chicago, IL 60601

**Counsel for Plaintiff**

Robert Andrew Chapman
Chapman & Spingola LLP
77 West Wacker Drive
Suite 4800
Chicago, IL 60601

Robert P. Thavis
Leonard, Street & Deinard
150 South Fifth Street
Suite 2300
Minneapolis, MN 55402

**Counsel for Defendant**